UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IAS SERVICES GROUP, LLC, | § | |
| *Plaintiff/Counter-Defendant,* | § | |
| | § | |
| v. | § | |
| | § | |
| JIM BUCKLEY & ASSOCIATES, INC., | § | |
| JAMES BUCKLEY, INDIVIDUALLY, | § | Civil Action No. 5:14-CV-180-FB |
| AND AS CO-TRUSTEE OF THE | § | |
| BUCKLEY FAMILY TRUST DATED | § | |
| 06/21/2014, AND BARBARA | § | |
| BUCKLEY, INDIVIDUALLY, AND AS | § | |
| CO-TRUSTEE OF THE BUCKLEY | § | |
| FAMILY TRUST DATED 06/21/2014, | § | |
| *Defendants/Counter-Plaintiffs.* | § | |
| | § | |

## SECOND AMENDED COMPLAINT

TO THIS HONORABLE COURT:

Plaintiff/Counter-Defendant IAS Services Group, LLC ("**IAS**") files this Second Amended Complaint against Defendants/Counter-Plaintiffs Jim Buckley & Associates, Inc. ("**JBA**"), James Buckley, Individually and as Co-Trustee of the Buckley Family Trust dated 06/21/2014, and Barbara Buckley, Individually and as Co-Trustee of the Buckley Family Trust dated 06/21/2014 (collectively, the "**Defendants**"), and states the following:

### I.     INTRODUCTION

1.     The Defendants painted a rosy picture of their business, JBA. The Defendants told IAS that JBA was the "number one" adjuster for QBE First Insurance Agency, Inc. ("**QBE**"), one of the largest insurers in the United States. They led IAS to believe that JBA would keep QBE's business after IAS purchased JBA. The Defendants even claimed that they were negotiating the sale of JBA only with IAS. All of these representations were false.

2. Based on Defendants' false representations, IAS entered into an asset purchase agreement with JBA, through which IAS agreed to purchase JBA for $3,600,000, the estimated value of JBA based on the Defendants' representations. But almost immediately after the agreement closed, IAS discovered that JBA had not secured nor even attempted to secure QBE's agreement to stick with JBA after its purchase by IAS, contrary to Defendants' promises. In the weeks and months that followed, IAS also learned that JBA had not been QBE's "number one" adjuster; far from it, JBA was QBE's <u>eighth-ranked</u> adjuster out of nine. Finally, IAS learned – from documents hidden on Jim Buckley's computer – that Defendants had indeed "shopped" IAS' offer to another buyer, contrary to Defendants' representations.

3. The consequences of the Defendants' lies were devastating. QBE did not agree to work with IAS after the purchase, depriving IAS of the primary asset that it hoped to gain from the purchase of JBA. Yet IAS had already paid Defendants $2,400,000 in cash, and agreed to pay $1,200,000 more, for a company that turned out to be nearly worthless. IAS was also compelled to spend nearly $1,000,000 more to stop the losses hemorrhaging from the shell of JBA and lost even more in goodwill, impaired credit, and the loss of opportunity. Through this action, IAS seeks to undo the damage caused by the JBA Parties.

## II.   PARTIES

4. Plaintiff IAS Services Group, LLC is a Texas limited liability company with its principal place of business located at 1020 N.E. Loop 410, Suite 805, San Antonio, Texas 78209.

5. Defendant Jim Buckley and Associates, Inc. is a California corporation that conducted business in California with its principal place of business at 19526 Connemara Court, Yorba Linda, California 92886. JBA may be served with process by service upon its registered agent Jonathan E. Van Cleave, 5 Corporate Park, Irvine, California 92606. JBA has been served and has answered.

6. James Buckley is an individual residing at 19526 Connemara Court, Yorba Linda, California 92886. He may be served as an individual and in his capacity as Co-Trustee of The Buckley Family Trust dated 06/21/01 at that address. James Buckley has been served and has answered.

7. Barbara Buckley is an individual residing at 19526 Connemara Court, Yorba Linda, California 92886. She may be served as an individual and in her capacity as Co-Trustee of The Buckley Family Trust dated 06/21/01 at that address. Barbara Buckley has been served and has answered.

### III.   JURISDICTION

8. Jurisdiction is proper in this Court pursuant to 28 U.S.C. §1332(a)(1), because Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000.00, excluding interests and costs.

### IV.   VENUE

9. Venue for this action is predicated upon 28 U.S.C. §1391(b)(2), where a substantial part of the property that is the subject of this action is situated. In addition, the Asset Purchase Agreement between Plaintiff and Defendants contains a valid forum selection clause conferring exclusive jurisdiction and venue on the state and federal courts in Bexar County, Texas. Defendants have waived the defense of forum non-conveniens.

### V.   FACTUAL BACKGROUND

10. IAS is a San Antonio, Texas based company involved in the nationwide business of insurance adjusting. JBA is a California corporation that was also involved in insurance adjusting.

11. On or about September 30, 2011, IAS and JBA entered into an asset purchase agreement (the "**APA**," attached hereto as Exhibit A) whereby IAS would purchase substantially

all of the assets constituting the insurance adjusting business of JBA. James Buckley and Barbara Buckley, as co-trustees of The Buckley Family Trust dated 6/21/01, joined in the APA and were designated as "Owner." James Buckley and Barbara Buckley, individually, also joined in the APA and were designated as the "Beneficial Owners." Exhibit A at 1.

12. Prior to the execution of the APA, Defendants and Plaintiff engaged in a period of negotiation from approximately February 7, 2011 through September 30, 2011. During this time period, the parties conducted their negotiations under a "no shop" agreement documented by a Letter of Intent dated June 21, 2011 ("**LOI**"). Drafts of the LOI had been circulated since March 9, 2011, so JBA was well aware of the importance of the "no shop" provisions. The LOI provided that Defendants would not engage in sales talks with other potential buyers of JBA.

13. Unbeknownst to IAS, at the time the LOI was delivered, Jim Buckley had signed an overlapping nondisclosure agreement (the "**Engle Martin NDA**") with Engle Martin & Associates, Inc. ("**Engle Martin**"), another company interested in purchasing JBA. The Engle Martin NDA allowed JBA to recall confidential information provided to Engle Martin on ten (10) days written notice, but JBA did not exercise this right. As a result, JBA was actively and secretly providing confidential information about the business and discussing a potential sale with Engle Martin to the detriment of IAS. In fact, documents reveal that James Buckley was still negotiating with Engle Martin the week before the APA's effective date.

14. The purchase price in the APA was $3,600,000.00. It was payable in cash in the amount of $2,400,000.00 and a promissory note in the amount of $1,200,000.00. There is a common industry-wide approach to valuing insurance adjusting businesses, and IAS applied that in setting the value that it used to compute a reasonable purchase price under the APA.

15. The principal component of the value of an insurance adjusting business is the revenue generated by the customer contracts. In this case, the customers are insurance companies that need independent adjusters to evaluate insurance claims and make recommendations.

16. JBA had contracts with its insurance customers, and those contracts were assets to be purchased by IAS. Under the terms of the APA, these contracts were to be assigned at closing.

17. Prior to the execution of the APA and during the "no shop" period of negotiations, Defendant James Buckley[1] showed IAS' President, Larry Cochran, income statements that included revenues from all of the JBA contracts, and he represented that such revenues would continue.

18. Under Article 2 of the APA, JBA and all of the Defendants also made certain written representations and warranties about these Contracts. Article 2 consists entirely of statements that all Defendants jointly and severally represented to IAS were true and correct. They warranted that the transaction once closed, would not "violate, conflict with, result in a breach of, constitute a default under, . . . , create in any party the right to accelerate, terminate, modify or cancel, or require any authorization, consent, approval, execution or other action by, or notice to, any third-party under, any Contract" to which the Defendants were a party. *See id.* ¶2.3. In other words, Defendants represented in the APA that either (a) assigning the contracts did not require customer authorization and would not give the customer the right to cancel; or (b) that Defendants would obtain any required authorization for assignment prior to closing.

19. The Defendants also represented that execution and delivery of the conveyance documents at closing would give IAS good title to all of the assets, which included these valuable customer contracts. *See id.* ¶2.9.

---

[1] As used throughout this Complaint, "James Buckley" means James Buckley Individually, as co-trustee of the Buckley Family Trust dated 6/21/01, and as a representative of James Buckley & Associates, Inc.

20. The Defendants also represented that they were not aware of any notice of termination under any of their contracts and that no material customers had decreased their business or expressed any intention to do so, whether orally or in writing, and that there had not been any material adverse change since January 1, 2010. *See id.* ¶2.12. More generally, but also critical, Defendants expressly represented in the APA that there was not a material adverse change to their business due to recent events. *Id.*

21. Defendants specifically represented that "None of the representations and warranties made by [Defendants] . . .contains any untrue statement of material fact or omits to state any material fact necessary in order to make the statements contained herein or therein, in the light of the circumstances under which made, not misleading." *Id.* ¶2.22.

22. The APA further gives IAS the absolute right to rely on these representations, stating "The right to indemnification, reimbursement or other remedy based on such representations, warranties, covenants and agreements **will not be affected by any investigation conducted with respect to, or any knowledge acquired (or capable of being acquired)** about the accuracy or inaccuracy of, or compliance with, any such representation, warranty, covenant, or agreement." *Id.* ¶5.1 (emphasis added).

23. The biggest customer of JBA was QBE. QBE's revenues constituted 45.3% of JBA's business in the year ended prior to the closing. Both during the "no shop" negotiation period and after execution of the APA, James Buckley represented to the President of IAS, Larry Cochran, that business would continue to grow. As James Buckley has further admitted – he expressly represented to Larry Cochran that JBA was QBE's "number one" adjusting firm.

24. The contract between QBE and JBA required JBA to obtain permission from QBE to assign the contract. Defendants knew this. In spite of the representations made in the APA that (a) JBA conveyed good and marketable title to all its assets (including the QBE contract), *see id.*

¶2.9; and (b) that nothing JBA did would constitute a breach or default in the QBE contract, *see id.* ¶2.11(a), Defendants failed to get QBE's consent to the assignment. Defendants did not notify Plaintiff of this failure prior to closing. IAS has now discovered that, contrary to their representations, not only did Defendants fail to obtain QBE's consent, none of the Defendants even <u>attempted</u> to get the consent of QBE prior to the closing as they represented. James Buckley admitted at his deposition that he never even intended to attempt to obtain QBE's consent prior to closing. Plaintiff discovered after closing that there is a complete absence of written correspondence and e-mail traffic with QBE on this issue.

25. At closing, despite not having obtained, or even attempted to obtain, QBE's permission, Defendants assigned the contract to IAS. Merely assigning the contract to IAS without QBE's permission was a default that gave QBE the right to terminate the contract a year earlier than the contract term.

26. Within days after the closing and after the Defendants had received $2,400,000.00 of IAS' money, James Buckley revealed that he did not have the consent of QBE, as represented in ¶2.3 of the APA, that QBE was not going to give the consent, and that QBE was terminating the contract.

27. Without the QBE contract, the assets purchased for $3,600,000.00 had a negative value because the business could only suffer losses – and it did.

28. After the loss of the QBE business, IAS notified James Buckley that he needed to replace the business right away in order for the company to become profitable. James Buckley has been wholly unable to do so.

29. Furthermore, only long after execution of the APA, representatives of Plaintiff discovered that JBA was the second to last (not first) among QBE's vendors, having dropped to eighth (of nine) from fifth place the year before.

30. This ranking flatly contradicts the statements made by James Buckley to Larry Cochran just prior to the time the LOI was executed regarding the position of JBA with QBE and the potential for growth of that business. Moreover, the failure to disclose this document contradicts Defendants' representations that JBA has not "experienced any Material Adverse Change" since December 31, 2009, *id.* ¶2.7, and that "[s]ince January 1, 2010, no Material Customer has decreased materially the goods and services it purchases from the Seller or has canceled, terminated, **or otherwise materially and adversely altered its relationship with the Seller, nor has any Material Customer expressed any intention or threatened (in writing or orally) to do any of the foregoing.**" *Id.* ¶2.12 (emphasis added).

## VI. CAUSES OF ACTION

### COUNT 1
### FRAUDULENT INDUCEMENT

31. Under Federal Rule of Civil Procedure 10(c), IAS incorporates by reference all the allegations set forth above.

32. James Buckley misrepresented to Larry Cochran that JBA was QBE's "number one" adjusting firm and that, as a result, the business "would continue to grow" at a time when he knew that JBA was in fact the number eight (of nine) firms and that the business had recently changed hands from Bank of America to a large Australian insurance company (QBE) and that the business was going through changes as a result. These misrepresentations were so material as to form a basis of IAS's financial analysis and pricing model for JBA. The misrepresentations went directly to the value of JBA's assets within a few months of the execution of the APA. These misrepresentations were false. James Buckley knew they were false or made them recklessly, as a positive assertion and without knowledge of their truth. James Buckley made these representations with the intent that Plaintiff act upon them, and while he was withholding documents in his possession showing that JBA had slipped almost to last place in QBE's vendor

rankings. Plaintiff did rely upon the misrepresentations, as permitted by ¶5.1 of the APA. The misrepresentations caused injury.

33.     Defendants also fraudulently induced IAS via misrepresentations in Paragraph 2.3 of the APA. Contrary to the representations made in ¶2.3, Defendants knew that execution of the APA would "violate, conflict with, [or] result in a breach of" JBA's contract with QBE – which required QBE's consent **prior to** assigning that contract to any other party. Defendants completely failed to obtain, or even attempt to obtain, assurances from their largest customer that it would consent to assignment of its contract to IAS. Defendants showed Plaintiff income statements that included the QBE revenue, knowing that Plaintiffs would rely on such statements to value the JBA business before signing the APA, even though Defendants never intended to obtain or attempt to obtain the permission required to assign the QBE contract. Indeed, in violation of the "no shop" provision Defendants were engaged in sale negotiations with Engle Martin and would not even have known which buyer to have QBE approve. Because Defendants knew that, through their own actions or inactions, the QBE contract could not be assigned, they misrepresented facts about the expected revenues of JBA prior to the time IAS and Defendants signed the APA. These misrepresentations were so material as to form the basis of IAS's financial analysis and pricing model for JBA. The misrepresentations went directly to the value of JBA's assets. These misrepresentations were false. Defendants knew they were false or made them recklessly, as a positive assertion and without knowledge of their truth. Defendants made these representations with the intent that Plaintiff act upon them. Plaintiff did rely upon the misrepresentations, as permitted by ¶5.1 of the APA. IAS did not agree and would never have agreed to acquire contracts had Defendants disclosed that they would intentionally wait until after cashing IAS's check at closing to attempt to secure the transfer and assignment of those contracts. In fact, if Defendants had performed as promised and warranted, QBE likely would have told Defendants that QBE

would not agree to the assignment.  That would have ended the sale process right then and there, and there would have been no transaction nor subsequent lawsuit.  The misrepresentations therefore caused significant injury – injuries that that could have been avoided had Defendants simply operated in an honest manner consistent with their representations.

34. James Buckley also misrepresented his promise under the LOI not to shop the IAS offer.  Knowing full well since March 9 that IAS did not want the confidential information of JBA to be disclosed and the IAS offer to be shopped, he signed an agreement with Engle Martin, a direct competitor of IAS, and disclosed volumes of confidential information about JBA.  After he signed the LOI with IAS, James Buckley continued to discuss a sale with Engle Martin at least up to the week before the APA closed and never required Engle Martin to return all confidential information.  Unbeknownst to IAS, it purchased a company that had shared all of its most sensitive confidential information to a direct competitor.  IAS relied on the "no shop" promise.  The promise was false when made.  James Buckley knew it was false or made it recklessly as a positive assertion without knowledge of its truth.  James Buckley made these representations with the intent that Plaintiff act upon them.  Plaintiff did rely upon the misrepresentations.  The misrepresentations caused injury.

## DAMAGES

35. IAS would not have entered into the APA if it not for the Defendants' fraud.  IAS therefore suffered damages in excess of $3,600,000.00, the difference in value of JBA as described by the Defendants and the value of JBA as actually purchased by IAS.  IAS has further suffered other direct and consequential damages, including transaction costs, financing costs, costs of mitigating the damage caused by the Defendants' fraud, loss in value of IAS, loss of credit, loss of goodwill, loss of opportunity, and attorneys' fees to the extent such can be recovered as fraud damages.

36. Pleading additionally and in the alternative, IAS further seeks full rescission of the APA, including cancellation of the Promissory Note executed and delivered in connection with the closing of the APA.

37. Pleading alternatively and in the event that the Court finds that the contracts that were the subject of the first trial were enforceable, IAS seeks its reasonable attorney's fees and recoverable expenses for prevailing on the severance claim.

## EXEMPLARY DAMAGES

38. Defendants' conduct was aggravated to the level of fraud, malice, or gross negligence, thereby entitling Plaintiff to exemplary damages.

## CONDITIONS PRECEDENT

39. All conditions precedent to IAS' claims for relief have been performed or have occurred.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff IAS Services Group, LLC, respectfully requests the following remedies individually and in the alternative where appropriate:

1. Damages in excess of the minimum jurisdictional limits of this Court;

2. Rescission and cancellation of the Promissory Note executed and delivered at the closing;

3. Exemplary damages;

4. Pre-judgment interest and post-judgment interest;

5. Attorneys' fees and expenses to the extent recoverable under law;

6. All additional relief that judgment in Plaintiff's favor on the fraudulent inducement claim requires, including relief from prior findings and/or judgments in this action, as appropriate; and

7. All other and further relief in law or equity to which Plaintiff may otherwise be entitled.

Dated: March 15, 2019

Respectfully submitted,

By: */s Jason Davis*
Jason M. Davis
State Bar No. 00793592
Email: *jdavis@dslawpc.com*
Jay Hulings
State Bar No. 24104573
Email: *jhulings@dslawpc.com*
**DAVIS & SANTOS, P.C.**
719 S. Flores Street
San Antonio, Texas 78204
Tel: (210) 853-5582
Fax: (210) 200-8395

***Counsel for Plaintiff and Counter-Defendant IAS Services Group, LLC***

## CERTIFICATE OF SERVICE

I certify that on the 15th day of March 2019, the foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system and all counsel of record will receive an electronic copy via the Court's CM/ECF system.

*s/ Jason Davis*
Jason Davis